I hear first from Jill Craft. Good morning, Your Honors. Jill Craft on behalf of Lori Rayborn, who I can note for the Court, is also present with her family. This case is the definition of a tragedy. It arises out of the suicide of a young child, and I will say the preventable suicide of a young child. My client's only crime in this entire ordeal was the fact that she logged in her notes what was going on with this child. She logged the fact that the child, who was a diabetic, was having trouble, for example, being singled out for a yearbook committee meeting. They wanted to do some sort of story on her, which upset her to the point she went to talk to the school nurse, my client. My client charted that in her notes in March of 2011. In April of 2011, the child had become medically noncompliant. Her glucose levels were all over the place. My client, again, did several things. She contacted mom, and then she went to the assistant principal of Parkway High School, Becky Gray, which she also logged in her notes. During that time frame in April of 2011, she spoke to the school counselor, Pat Faulting, which she also logged in her nursing notes. At that time, according to my client's testimony, Ms. Faulting told her this little girl was being bullied, bullying consisting of postings on the Internet that she would be better off dead after her first suicide attempt in February or January of 2011, comments by her fellow students that because she's a diabetic, eventually she'll lose her legs and be of no use to society, my client's crime, logging that in her notes, reporting it to school administration. So as we fast forward, on May 20th, 2011, this child killed herself. After this child killed herself, understandably, her parents filed suit, which is in the record. At some point in time, a subpoena ducis tecum coupled with a subpoena for production, which is a subpoena to testify but produce a record in lieu of testimony, was issued for my client in March of 2012. At that time, my client was brought into the principal's office, Principal Bourgeois, who she testified started off the meeting, came in for what was exuberant but bubbly and willing to talk and all this kind of business, and she says to my client, are there any red flags? My client says, well, absolutely there are. Here are the two occasions where I logged in. I had talked to Ms. Barger at your office about the child being noncompliant. There was also an issue logged in her notes, which she went to Ms. Bourgeois's secretary and reported, about the fact that the child was being denied the ability to check her blood glucose in class by a substitute teacher. Yes, I logged in the fact that I had talked to Pat Faulting in March or April of 2011, at which time Ms. Faulting had reported that she also was aware of bullying, which she had reported to administration. And yes, in April before this child's death, I noted that she was noncompliant. I called mom, and I reported it to your assistant principal, Becky Gray. What happened on summary judgment, in my opinion, was the judge confined himself only to what's contained in the notes, which are found in the record, I believe, at 1060, 67, and 68. He overlooked what my client said, which is what caused this entire ordeal. As my client testified toward the end of that meeting taking place in 2012 with the principal, the principal became distant, cold, refused to speak to her. That's how the meeting ended. After that, the situation in my client's workplace disintegrated tremendously. One of the things the district court talked about was we don't have, you know, a complete unbroken chain. We don't, because schools are not in session from May until August. So when you look at the timeline of events, when my client returned to school in August of 2012, after the initial meeting, the production of her notes, and the identification of the red flags, her protected speech. When she returned to school in August of 2012, she saw the principal, the same principal, standing in the hallway mocking her to her secretary, making fun of my client. She was reprimanded on August 22, 2012, by her supervisor, Ginger Hughes. In my client's testimony at Record 1998-2001, she testifies that when she asked Hughes a question, why is this happening, Hughes told her it's because your nurse's notes expose their inadequacies. You are no longer an asset, and your nurse's notes have created a liability for the school system. In addition, significantly, Hughes told her she was being reprimanded because she used the words for bullying and harassment, and she had given them, quote, no wiggle room. In 2000, at Record 2000, Hughes also told my client that she was able to downgrade the punishment that Bourgeois wanted to impose upon my client. Downgrade, her words, to only a verbal reprimand because the principal originally wanted an involuntary transfer and a written reprimand. Those were her words. I'm downgrading your punishment. Yet, in granting summary judgment, the district court concluded two things. Number one, it conflated, arguably, requirements for First Amendment retaliation to LARS 23-967, which is, according to this court in Schroeder, it's a much broader statute. It's not confined as we might consider a 1983 First Amendment claim, number one. Number two, the court said, well, when she ultimately was involuntarily transferred, that did not constitute an adverse employment action. So, therefore, for the purposes of the 1983 First Amendment retaliation claim, and as what near I can gather from the one paragraph granting summary judgment on the state reprisal claim, the involuntary transfer didn't cause a loss in pay, so, therefore, it is not an adverse action. It's not actionable. That's not the law. In White, the Supreme Court made clear, when we're looking at retaliation claims, and even this court has in several of its opinions, even in 2015 and 2016 recently, the law is whether or not the action taken against the employee would likely dissuade another person from reporting it. That's the law. It's not triggering upon whether or not you lost the pay. It's the effect on the other employees. Why? Because the purpose of protecting whistleblowers is so that we don't have a society that's silenced because they're afraid and unprotected. In the 23-967 claims, when we look at the text of 23-967, which this court does repeatedly, when you're talking about, for example, Title VII retaliation claims, the because of language, as opposed to the created claim. The involuntary transfer. Yes, sir. And you contend that's an adverse employment action? I absolutely do. Why is it an adverse employment action? Several reasons. Number one, my client's children attended high school, so being at that high school environment was appropriate for a family, number one. Number two, because transferring, she got transferred over to an environment which she describes, for example, them having a tied, a cutoff tied bucket with needles outside her, what I would loosely refer to as her office. She described the office space. She also described the fact that she no longer had her responsibilities with the high school students with whom she had developed a relationship the entirety of her employment. And more important. She got transferred to another school. A middle school, yes, sir. Which is a public school. Yes, sir. So the complaint is this is just a school nobody wants to be, nobody wants to work there, so that's why it's adverse? The complaint is twofold. Number one, under 23-967, there is no adverse employment requirement. In fact, if you look at subpart C under 23-967C, it says any action taken in reprisal, which includes firing, demotion, or any other act the court may find discriminatory taken as a result. So it doesn't have to be an adverse employment? No, it does not. I thought I heard you contending that this was an adverse employment. Well, I think it is if you review it in light of White v. Burlington Northern. Because what Burlington Northern says is we know we use this phrase adverse employment action repeatedly when we're evaluating retaliation claims, we know we do it. But the real trigger is not the loss in pay. The real trigger is whether or not it likely dissuades some other worker from coming forward. So that's why I use that phrase. And what was critical in White, when you look at the facts of White, is that was originally a suspension, I think, without pay, like for 45 days. And then the employer came back and said, we're just kidding, here's your money back. There's no loss of pay. That's how it factually presented itself to the Supreme Court. In this particular circumstance, as I submitted in my brief, there's two different standards. 23-967, the State Reprisal Statute, which is wide open. As this Court has said, specifically in footnote 4 of Schroeder, it's much broader than any other written retaliation statute. In that case, it had to do with the Credit Union Anti-Retaliation Act. Do you contend that there was discrimination, discriminatory action? Yes. Taken as a result of an action by the employee? Yes, I absolutely do. What was the discrimination? Well, there's a couple of them. Discriminatory action? Sure. And what was the action by the employee? Okay. The action by the employee under Subpart 1A of 23-967 was reporting, opposing, and threatening to expose, essentially an action in violation of law, which was the denial to this student of her ability to glucose test in school, the 504 requirements that the student be allowed to have those accommodations which were denied to her, and the bullying in the schooling environment. Did Ms. Rayburn disclose? I'm sorry? Did Ms. Rayburn disclose or threaten to disclose a practice that was in violation of the law? Yes, sir. What was that? That was the discussion she had initially in May of 2011, I'm sorry, March of 2012 with the principal, where she said, here are my notes. Are there red flags? Yes, there are. Here's what I've noted, and these are the problems. The problems are you denied this little girl the ability to test her glucose in class in April of 2011, a matter of less than one month before her suicide, that the girl was being bullied, there was a yearbook issue, and the yearbook issue. Were those violations of the law? Those are violations of, and I'm, I don't know how to say it, but number one, for the purposes of the equal provision of an education, a free and appropriate public education. Number two, her rights as a disabled student, because she does qualify as a disabled student. Number three, under Act 504, which is part of the Rehabilitation Act, she's entitled to have accommodations for her disability in the school environment, including the ability to check her glucose in a classroom. Number four, her right to be free from bullying and harassment in that school environment, and her right to be protected as a student in the school environment. Now, she threatened to disclose this to who? In response to the subpoena. That's how they're. . . Disclose it at a deposition. She actually disclosed it in response to the subpoena, which was part of the litigation. That's why her supervisor told her she was being transferred. That's why her supervisor told her, I'm giving you a reprimand because you exposed our inadequacies,  But the notes that we're talking about, she'd already created those notes. She had already. She didn't generate any notes or statements for purposes of giving a deposition. No. She had the notes. She already had her records. They were subpoenaed. And in that conversation, she explained the significance of the notes for the purposes of the existing lawsuit. But I guess where I'm going is if she had a subpoena to show up at a deposition, she's supposed to tell the truth. Absolutely. Absolutely. In this particular circumstance, the other thing is, in response to your question, when she was transferred, the involuntary transfer occurred on January 29, 2013, at the same time she was likewise reprimanded. So the transfer was, in fact, imposed as a disciplinary measure against her. Again, I think the biggest problem is the fact that we're dealing with two separate claims, First Amendment retaliation and reprisal, which are judged by different standards. The First Amendment retaliation claim, the court dismissed, alleging Garcetti barred its application because she kept her notes. It was part of her job as a nurse. So, therefore, under Garcetti, it's not protected. We're going to grant qualified immunity. In this particular circumstance, we submit Garcetti does not bar it because it is the speech in presenting the notes and the knowledge she possessed, which she disclosed to her supervisor, who then immediately sprung to action, changed the behavior, began reprimanding this, quote, excellent employee. She got a poor evaluation along the way. It affected her ability to promote down the road and ultimately involuntarily transferred to an undesirable reassignment and forced out of her job. Well, in a connection with poor evaluations, she didn't get any negative evaluations until after. Until after, right, 100%. In fact, she was always considered a, quote, asset to the school system, and when she had that first reprimand meeting with her direct supervisor, Ms. Hughes, she said, you're no longer an asset. Why am I no longer an asset? Because you exposed their inadequacies in your notes. You have opened us up to liability for the death of this girl. And the problem with the entire situation, as I put in a footnote, is the first death occurred in May of 2011. That little girl's friend killed herself a year later. That school did nothing. What's the status of the parents' suit against the school? I believe it's been settled. Senator? Thank you. You will have time on rebuttal, Ms. Cooper. Mr. Noah? Good morning. Elmer Noah, Hammond, Sills, Atkins, and Geis, appearing on behalf of the appellees, Bossier Parish School Board, Dr. Nicole Bourgeois, the principal at Parkway High School in Bossier City, and Ms. Ginger Hughes, who's the nursing supervisor for the school system and their insurer. Your Honors, the background facts, obviously we disagree with Appellant's presentation of those. There's no disagreement that this young lady that initials HDC tragically committed suicide. I believe she was a sophomore student at Parkway in May of 2011. Several months later, a lawsuit was brought by her mother, a number of allegations. One was that the child had suffered bullying by various students and others. In connection with the litigation, HDC's nursing records that were maintained by Nurse Rayburn were subpoenaed in connection with that litigation. Now, an undisputed point that was brought out by the district court in its ruling on the motion for summary judgment was there is no mention of any discussion by Nurse Rayburn with HDC or her mother regarding either bullying or suicide in Nurse Rayburn's nursing notes. So no mention of bullying, no mention of suicide. Nurse Rayburn was notified of the subpoena for the records many months later after the suicide. We have the actual dates, March 20, 2012. Those records were produced to the nursing supervisor, Ms. Hughes. And then there was a meeting with Dr. Bourgeois. Now, the red flags that counsel has referred to that were discussed in the meeting basically were areas of concern that Nurse Rayburn expressed. One was her contention that the child and that the parent had requested a 504 plan. That is disputed. The position of the school board is that, according to the testimony of the guidance counselor, Martha Lee, that she never denied a 504 request nor even received a 504 request regarding a diabetic student. In fact, the child did have an individualized health plan, which was being monitored by Nurse Rayburn. The child was a good student, and so under 504 did not require any type of academic accommodations or extended period, extended time. Her issues were health, and the thing that she was given was an individualized health plan. Ms. Hughes never had any discussions with Nurse Rayburn about HTC or any accommodations or requests for accommodations. So Ms. Hughes said that that was something that was not brought to her attention. A couple of the incidents are the quote, unquote, red flags that were mentioned. In March of 2011, shortly before the child's death, the yearbook incident that was referred to, basically the yearbook editor and the writers were going to do articles about students that attended Parkway that had overcome disabilities. And someone, another student, I presume, or possibly even a teacher, approached the student about an article about her overcoming her diabetic situation. The student expressed some reluctance to do that. She went to the assistant principal, Ms. Gray, and at that point, the teacher, the yearbook sponsor, was contacted. The student did not want to participate, and so that ended it. In May, there was a complaint noted about there was a substitute teacher that was present in class. The child asked to leave class to do some glucose monitoring. The substitute teacher was not aware of that. That was brought to the substitute teacher's attention, and that issue was immediately addressed. And so that situation did not happen again. There was apparently, according to Nurse Rayburn, some type of sudden change in the child's conduct or behavior prior to her May 2011 suicide. In April of 2011, she was noted to have high glucose levels. And so Nurse Rayburn did contact Mom about recommending diabetic counseling and a follow-up with the child's physician. That was in April of 2011. When you say, and a follow-up with the child's physician, did she follow up or recommend that the parents follow up? Nurse Rayburn followed up. Nurse Rayburn recommended to Mom that she had noticed, because of some high glucose levels and some changes, apparently, in the child's demeanor, that she requested a diabetic, that she – there was an issue there at some point about the child's noncompliance with taking her – I don't understand all that. I just wanted to – I was just concerned about what Nurse Rayburn did. And you tell me. She contacted the parents and – She had a discussion with the child and the parent about recommending the diabetic counseling and that they follow up with her physician, because there had been some issues about noncompliance. May 12, 2011, there was a high glucose level that was addressed. The child came down to the office, got a bottle of water, went back to class, and apparently things at that point were fine. Shortly thereafter, tragically, the child committed suicide. Now, after the March 2012 meeting, when the records were subpoenaed, Nurse Rayburn's contention is that there was a change in Dr. Bourgeois' demeanor, Ms. Hughes' demeanor, toward her. I think it's pointed out by the district court that's totally unsubstantiated. That's a conclusory observation. As a matter of fact, Nurse Bourgeois testified – excuse me, Dr. Bourgeois testified that after this meeting happened in March, there was something – there's a school activity called the Amazing Race to Stamp Out Bullying, which was a fitness program that the faculty participated in. That was something that was Ms. Rayburn's idea that she and Dr. Bourgeois worked on together. Dr. Bourgeois complimented Nurse Rayburn for being involved with this particular program. That would have been in the late spring of 2012 after this meeting where the administration supposedly turned on Nurse Rayburn. Now, this whole situation is really about two incidents. One that happened in August of 2012 where there was a confrontation between the school secretary, Michelle Barger, and Nurse Rayburn. It was the beginning of school. There was a dispute that happened in the office in the presence of students and parents and faculty members between Ms. Barger and Nurse Rayburn. Apparently, some of the older medications from the previous year had not been disposed of. Ms. Rayburn was contending that medications were not being logged in properly by the school secretary. But the point is there was an inappropriate confrontation between these two employees in front of students and parents. And after this confrontation took place in the office between Nurse Rayburn and Ms. Barger, Dr. Bourgeois counseled with both ladies, reprimanded verbally both ladies and said, Look, there's a time and place for everything. We don't need to do this out of the office where there are students and parents present. Shortly after that meeting in August. Where did that incident occur? I'm sorry? Where did that incident occur? The incident occurred in the school office. In the what? In the outer office, the school office, in the open area in the presence of students, parents, other faculty members. What were they doing in there, the students? Well, this is the open area where they come and go and students come in the mornings and parents come in the office. It's not Dr. Bourgeois' office. It's just a common area of the school. And so this confrontation took place while everybody's coming and going. And Dr. Bourgeois thought correctly, I believe, that this was inappropriate behavior on both ladies' part. She reprimanded both the ladies and counseled with them. So a couple of weeks later, Dr. Bourgeois had a meeting with her office staff, including Nurse Rayburn, Ms. Barger, another school secretary, Ms. Kendall, to talk about these issues. And one thing that came up was the institution of a 911 program where if a student would have an issue or if there was an emergency on campus, that 911 would be called. Nurse Rayburn, there's some evidence that she had complained. She was not at Parkway all day. She spent more or less half time at that school and time at another school. So she was not always there. So that was one reason why calling 911 in the event of an emergency was contemplated. What was her complaint? I'm sorry? What was her complaint? You said she complained. Her complaint was that the staff were calling her personal cell phone. When she was not actually situated in her office, when they would need her, they would call her cell phone, and she complained about them calling her personal cell phone. So there was also some discussion. There's some e-mails that were referred to in the record that Nurse Rayburn even consented to the idea of calling 911. So basically they complained about that. I'm sorry? I thought she resented the fact that they would call 911 before they would seek out her guidance. Well, that was the contention. But, again, the complaint was that they called her personal cell phone, and so Dr. Bourgeois said, look, we're going to institute a policy because you're not always here. We don't know where you might be located in school. In emergencies where 911 is needed, we're going to call 911. That's going to be our practice and our policy. And so that took place in late August. Now, there aren't any other recorded incidents or problems or anything that reflect in the record between August of 2012 and January of 2013. Now, in January of 2013, there's an incident that happened in the school cafeteria where a student passed out during the lunch hour. Nurse, excuse me, Assistant Principal Gray and Assistant Principal Baker were on site, on the scene, and according to the plan that had been established the previous August, they called 911. The record reflected that 911, the EMS folks showed up within five minutes to address the student that had passed out. The record also shows that while this was going on, two paraprofessionals went to the school office, went to Nurse Rayburn and informed her that a student had passed out and that 911 had been called. Later on that day, Nurse Rayburn came to Dr. Bourgeois' office and more or less confronted Dr. Bourgeois about why she had been intentionally left out of the situation. Dr. Bourgeois' response was, well, we had already established that we would call 911. There was no intent to leave you out of the situation. As a matter of fact, there's some indication in the record that when she was informed of this, she left her office. She walked to the area of the cafeteria. She saw the situation was well in hand with the EMTs, and so she left and went back to her office. But anyway, she complained about this, and the testimony was that she was upset and she stormed out of Dr. Bourgeois' office and said, this is fantastic, or words to that effect, in front of other staff and other parents. So after this emotional outburst by Nurse Rayburn, there was a conversation between Ms. Hughes and Dr. Bourgeois, and the next day, Ms. Hughes met with Nurse Rayburn. Now, according to Ms. Hughes, Nurse Rayburn brought a draft of a letter of resignation to that conference that the two ladies had. According to Ms. Hughes, she more or less persuaded Nurse Rayburn to reconsider that, and in lieu of following up on the resignation, basically in Ms. Hughes' appraisal or her estimation, she felt the best way to handle that would be a transfer. Because of the situation that happened in August where she had counseled with Ms. Rayburn, the situation that happened the day before where she had the outburst with Dr. Bourgeois and she said, this is fantastic, and stormed out of her office, it was Ms. Hughes' opinion that a transfer would be appropriate, and that's basically what she recommended and what was done in the end of January 2013. She was transferred from Parkway to an elementary and a middle school, which were in fairly close proximity to Parkway. Counsel mentioned the fact that her two daughters were students at Parkway. That's true, but you have staff all over the parish. You can't demand to work at a school where your children work. That's wonderful if you can, but that doesn't always work out that way, and that wasn't done punitively. But she was transferred to the other school. She had served at, I believe, one of the schools before. It was an older school. It was not a demotion. Parkway was a brand-new high school. Everybody wanted to work at Parkway. It was a beautiful new school. The other school was not as new a school as Parkway. The office was not as big as the school office at Parkway. But nonetheless, all nurses basically are on the same level at Bossier, the same pay, rank, status, that sort of thing. So there's no demotion involved. There's no reduction in pay. And so from the end of January 2013 until the end of the school year, she continued in the new position where she was transferred. So there's no record about there being any problems. I think there's some questions about her attendance, but basically there were no huge issues at that point. She finished the school year, and then she went on to, in June, she got a job at one of the hospitals in the Shreveport-Bossier area, Overton Brooks Medical Center, the VA hospital, and worked there in June and July. And then in late July, she tendered her resignation, hand-delivered her resignation to former superintendent D.C. Machen and said, you know, I'm out of here. So basically that's the factual recitation here from the school board standpoint. Now, if I could just briefly go through, you know, some of the legal issues here. The trial court in its motion, in its ruling on the motion for summary judgment, obviously the 42 U.S.C.A. 1983 claims on the First Amendment and the Fourteenth Amendment, the ruling we believe was correct by the district court regarding the school board, the municipal liability issue. The court found that there was the plaintiff failed to identify any official school board policy or custom, much less show that any alleged violation resulted therefrom. So the court held correctly, found that there should be judgment rendered in favor of the Bossier Parish School Board on the 1983 claims. Now, the individual and official capacity claims against Bourgeois and Hughes, on the official capacity claims, again, the court correctly held that the official capacity claims should be treated as claims against the school board and should be dismissed. The individual capacity claims, the defendants raised the issue of qualified immunity, and the district court was correct in holding that Rayburn's First Amendment right of free speech was not violated. And again, citing the Garcetti case, she was not speaking as a citizen on a matter of public concern in her nurse's notes. That was something she did in the course and scope of her employment. It was not something done outside of her employment. So following the logic of the Garcetti case, she was not speaking as a citizen, so there was no First Amendment deprivation there. She did that as part of her normal job responsibilities. The court found that the allegation of the nurse's involvement with the student HTC, those allegations that her involvement with that materially affected her employment and motivated the defendant's retaliatory action, simply were conclusory allegations, speculation, and unsubstantiated assertions. I think the record backs up the district court on that particular point. The evidence was insufficient to establish that the plaintiff did not meet the first prong of qualified immunity analysis. On the retaliation claim, briefly, there was no adverse employment action. Your Honor mentioned that a minute ago. The transfer involved, there was no punitive action to that. Are you discussing the state cause of action, state law cause of action, or the Federal? No, the Federal on the retaliation. There was no adverse employment action at all there as far as they were concerned. She did not suffer an adverse employment action. The transfer was not sufficiently punitive. And the discharge, it was not that any reasonable person would have felt compelled to resign, so this was not a constructive discharge. Thank you, sir. Your time has expired. Yes, sir. Ms. Craft, you have five minutes on rebuttal. Yes, sir. This is a motion for summary judgment. What you just heard in terms of a recitation of facts is hotly and highly disputed, for example. At record page 2008, when asked about the exclusion from medical calls, now this is a registered nurse. My client was asked the question, and did Dr. Bourgeois in the course of that meeting tell everyone that we're going to exclude Laurie Rayburn from medical emergencies? She said whether she was on campus or not, they were to call 911. My client went on to say, I clarified with Dr. Bourgeois, are you excluding me from one of my job duties? I'm here to deal with medically compromised students, to which Bourgeois said, she said, I sought clarification on that. This is my client at record 2009. Asked her if that meant them excluding me from 911 calls, and she said, Bourgeois, they handled their business. And I said, are you referring to excluding a nurse from a medical emergency? Then you are putting the students at this school at liability and jeopardizing my nursing license, to which my client testified that Dr. Bourgeois said, yes. So what happened was not some sort of cafeteria fainting. It actually occurred on January 28, 2013. It's in the record, same spot here. It starts at record 2011. A male student collapsed in the cafeteria. My client was there, and all these people, the two assistant principals, had just talked to her and knew she was on campus. They don't notify her of any kind of medical emergency. They instead call 911 and wait until those folks get there with a collapsed student in the middle of the cafeteria. Unlike how counsel recites the testimony, what my client said was the only way she found out about it is some paraprofessional came to her office after it was over. This is at record 2011, and told her there had been a medical emergency. My client goes to the cafeteria. She runs into assistant principal Lorenzo Baker and says, what's going on? He's like, don't worry about it. We got it. We've called 911. You're not to be called. You asked about adverse employment action, judges, and I wanted to refer to one of my cases, actually. And this was the case which this Court decided, Hare v. Board of Supervisors of LSU. It's 719-Fed-3, 356, and I'm specifically referring to the discussion at 358. In Hare, one of the issues was, well, she wasn't actually terminated, Jill. She didn't actually lose pay. But what was happening is they were systematically restricting and removing from her her job responsibilities. Same situation here. In the Hare case, this Court concluded correctly. Under White, the standard is whether or not it likely dissuades another worker. In Hare, this Court concluded for a Title VII retaliation claim that the actions imposed upon Ms. Hare were sufficient to trigger anti-retaliation protection. They did not in Hare involve a transfer as is here. The other thing, Your Honor, when you asked about the transfer itself, she's getting the same pay. It's just another school. That's not how administration saw it. What you heard was counsel's recitation of Ms. Hughes in her deposition. What my client said that she said was the reason for the reprimand, the first one, she said Dr. Bourgeois had requested that I be reprimanded. There was also mention of me being transferred. And Ginger Hughes said she was able to have it downgraded to a verbal reprimand. She said I was being reprimanded because I used the volatile words such as bullying and harassment. And she said that because I used those direct terms that I didn't give them any wiggle room. She goes on to say that the reason it keeps happening, she said it's because your nurse's notes expose their inadequacies. This is Record 2001. And that whereas Ginger had in the past referred to on my evaluation as being an asset and that I was no longer an asset and that my nurse's notes had created a liability. It's impossible to state in a situation where we have a supervisor acknowledging direct evidence of retaliatory animus that because the school says it ain't so, then summary judgment should be granted. The whole purpose of summary judgment essentially is to take out credibility calls and no weighing of evidence whatsoever. In our record of the nurse's notes, as I pointed out earlier, they are not as portrayed. Those are found at Record 2076 and 2077. In the notes in April, for example, it's not just there was some yearbook instance. It talks about the fact that the students wanted to make an example out of this child for having a disability. The child was so upset about it, she went and talked to my client and said, can you make this stop? This is all this poor child's universe after her first suicide attempt in February of 2011. This is all known. In addition to that, your honors, it didn't stop there as it relates to that child. And the reason my client was reprimanded, reprimanded, poor evaluation, essentially affecting her promotional opportunities and transferred to her undesirable reassignment is for the simple fact that she told them, exposed their, quote, inadequacies and told them that they were responsible. And they knew it. The only difference is she documented it. It happens all too often in this line of work where you have he said, she said. Folks owe their jobs or their livelihoods to an employer. My client was wise enough to document what was going on with this girl. Where did she document it? In her notes? In her nurse's notes, yes, sir. In addition, she filed two grievances requesting for a name-clearing hearing. In addition to that, she kept an accurate log of what was going on in terms of the harassment, which is likewise in the Record contemporaneous notes. Thank you. She did ask for a name-clearing hearing? She did. She submitted two grievances in March of 2013 and then thereafter again, I believe, in April or May of 2013 through the union and specifically asked for a name-clearing hearing. They had no hearing. Grievances were rejected and never addressed. That's the LaRavia case, which unfortunately I lost in this court for the same reason. But she darned sure in this case asked for it. Okay. Thank you. Thank you. These cases will be taken under FISA.